[Civ. No. 10999.   Third Dist.   Oct. 13, 1965.]

JUANITA HANSEN et al., Plaintiffs and Appellants, v. THOMAS RICHEY et al., Defendants and Respondents.

David C. Dormeyer, for Plaintiffs and Appellants.

McGregor, Bullen & Erich and Donald McGregor for Defendants and Respondents.

FRIEDMAN, J.—Plaintiffs were the parents of Joseph Cooper, who was accidentally drowned at the age of 19. Their wrongful death action went to trial, and at the close of the plaintiffs' evidence the defendants moved for a nonsuit, which was granted. Plaintiffs appeal from the judgment.

Joseph Cooper and his friend, William Young, attended a teen-age party at the home of the defendants, Mr. and Mrs. Thomas Richey, on an evening in January. Between 100 and 150 youthful guests were present. Many of the guests were school acquaintances of the Richeys' daughter and had never been at the house before. The party ended shortly after midnight. Joseph Cooper could not be found by his friends, who left the party without him. The following day about noon defendants found Joseph's body lying at the deep end of their swimming pool. The pool had been emptied, but several feet of rainwater had accumulated at the deep end. Joseph had fallen into the pool and sustained a skull fracture. The cause of death, however, was drowning.

At the rear of the Richey home was an enclosed patio room, forming a corner of the house. The pool was L-shaped, bordering each outer wall of the corner patio. At two corners of the patio room a door opened outward to the pool area. Outside one of these doors only 3 feet of concrete deck separated the pool from the outer wall of the patio. A cleaning brush at the end of a long metal pole was found lying on the pool deck at a corner of the pool away from the house. Joseph's body was lying at that corner of the pool.

The party took place in the Richeys' living room, in the family room and in the rear enclosed patio. Mr. Richey testi-

fied that he announced to some of the guests that no one was to go outside the patio area. He did not tell the guests that there was an empty swimming pool just outside the patio door. William Young, Joseph Cooper's companion, testified that he heard no instruction not to go outside the patio. He did not even see Mr. Richey during the evening.

In anticipation of the party Mr. Richey had placed an industrial heater in front of one of the doors leading out to the pool area. The other door from the patio to the pool was in a corner of the room and had been blocked by a serving bar placed at an angle across the doorway. A bartender was behind the bar to serve soft drinks. Mr. Richey stated that "to his knowledge" the bartender remained behind the bar during the entire evening. During the party Mr. and Mrs. Richey were playing cards with another couple in another part of the house, but occasionally visited the area where the youngsters were. On one occasion during the party Mr. Richey went out into the patio and saw the heater exactly where he had placed it.

William Young, Joseph's companion, testified that he saw the bartender in other parts of the house at various times during the evening. He also saw the heater, which had been pushed back against the wall. William himself went out into the pool area briefly and saw other youngsters out there. The pool area was unlighted, but the pool and its relatively empty condition were visible. No one had told him that there was a pool just outside the patio door. He and Joseph had never visited the Richey house previously. While he was in the patio he saw two youths dance from the patio out through the door to the pool area.

Although only soft drinks were served by the hosts, William and Joseph had brought with them a half-pint of vodka. Joseph had not only consumed some vodka but also had drunk a can of ale given him by another boy. An autopsy disclosed that Joseph had a blood alcohol level of .095 per cent at the time of his death.

■ A motion for nonsuit may be granted only when plaintiff's evidence, given all value to which it may be entitled and drawing from it every legitimate inference, is not of sufficient substantiality to support a verdict in favor of the plaintiff. (*Palmquist* v. *Mercer*, 43 Cal.2d 92, 95 [272 P.2d 26].)

California doctrine on the subject of landowner's negligence liability consists of a system of traditional tests evolved in

the course of common law development. The injured plaintiff is classified as an invitee, licensee or trespasser on the premises, according to the circumstances of his presence. These three status descriptions evoke descending gradations in the level of care demanded of the landowner. Suffice it to say here—and plaintiff's counsel correctly concedes the point—that Joseph Cooper was purely a social visitor, or in technical parlance, a licensee, in the Richeys' home. (*Huselton* v. *Underhill*, 213 Cal.App.2d 370, 373-374 [28 Cal.Rptr. 822]; *Bylling* v. *Edwards*, 193 Cal.App.2d 736, 742 [14 Cal.Rptr. 760].)

According to established California case law, a licensee takes the premises as he finds them; toward him, the landlord is not liable for a defective condition of the premises except one which amounts to a trap; there is, however, a distinction between passive and active conduct; thus, while the landowner is not liable for his passive negligence, he is liable to the licensee for "wanton or wilful injury" and for negligent "active conduct." (*Palmquist* v. *Mercer, supra*, 43 Cal.2d at pp. 101-102; *Oettinger* v. *Stewart*, 24 Cal.2d 133, 137-139 [148 P.2d 19, 156 A.L.R. 1221] (overruling prior cases); *Turnipseed* v. *Hoffman*, 23 Cal.2d 532, 534-535 [144 P.2d 797]; *Huselton* v. *Underhill, supra*, 213 Cal.App.2d at pp. 374-375; *Bylling* v. *Edwards, supra*, 193 Cal.App.2d at pp. 742-743; *Nelsen* v. *Jensen*, 177 Cal.App.2d 270, 271-272 [2 Cal.Rptr. 180]; *Free* v. *Furr*, 140 Cal.App.2d 378, 383 [295 P.2d 134]; *Fisher* v. *General Petroleum Corp.*, 123 Cal.App.2d 770, 779-780 [267 P.2d 841]; 35 Cal.Jur.2d, Negligence, § 101, p. 611; 2 Witkin, Summary of Cal. Law (1960) pp. 1448-1450.)

Both in its national and California manifestations, this traditional doctrine has aroused criticism from jurists and commentators. (*Gould* v. *DeBeve* (D.C. Cir.) 330 F.2d 826; *Potts* v. *Amis*, 62 Wn.2d 777 [384 P.2d 825]; *Palmquist* v. *Mercer, supra*, 43 Cal.2d at pp. 103-107, concurring opinion; *Scheurer* v. *Trustees of Open Bible Church*, 175 Ohio St. 163 [192 N.E.2d 38], dissent; Prosser, Torts (3d ed.) p. 388; 2 Harper & James, Torts, pp. 1476-1478; 1964 Annual Survey of American Law, Bloustein, Torts, pp. 429-433; Comment, 7 Stan.L.Rev. 130.) Expressive of a "newer" approach which eschews the rigid traditional classification is the test of "reasonable care under the circumstances" toward anyone whose presence is known or reasonably to be expected. (*Potts* v. *Amis, supra*, 384 P.2d at p. 829.) A parallel approach, described in section 342, Restatement Second of Torts would retain the traditional licensee classification but would elevate

the landowner's duty by requiring him either to remedy the danger or warn the licensee.* This Restatement rule was embraced in *Newman* v. *Fox West Coast Theatres*, 86 Cal. App.2d 428, 432 [194 P.2d 706], decided in 1948. The *Newman* case, however, has had no progeny and was inferentially renounced when the court which decided it concluded in 1954 that Restatement section 342 was not the law of California. (*Fisher* v. *General Petroleum Corp., supra*, 123 Cal.App.2d at p. 780.)

It has been suggested that the California Supreme Court decisions embracing the ''active conduct'' rule involved dangerous conditions and not a failure to warn; hence, that these decisions do not prevent intermediate appellate courts from embracing—as did the *Newman* case—the demand for a warning of danger proclaimed by Restatement section 342. (7 Stan. L.Rev. at p. 138.) The suggestion is inacceptable. A rule which permits a landowner to remain passive in the face of his licensee's proximity to danger permits no demand for affirmative action, either to remedy the danger or to warn of it. A doctrine may be undesirable which exculpates for inaction, yet imposes liability for action, in the face of recognizable danger to a recognized visitor. Nevertheless—as did the court in *Fisher* v. *General Petroleum Corp.*—we believe that application of Restatement section 342 is precluded by the California doctrine enunciated in Supreme Court decisions such as *Palmquist* v. *Mercer, supra,* and *Oettinger* v. *Stewart, supra.*

■ The partially empty pool, however dangerous, was an inactive factor in the accident. In possessing this dangerous condition and in failing to convey warning of it, defendants were at most passively negligent. In California such passive negligence constitutes no ground of liability for the death or injury of a social visitor.

■ The evidence did not justify submission of the case

*Restatement Second Torts, section 342, provides:

''A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,

''(a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and

''(b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and

''(c) the licensees do not know or have reason to know of the condition and the risk involved.''

to the jury on the theory that the partially empty pool was a trap. ▮ A trap is a concealed danger known to the defendant, that is, a danger clothed with a deceptive appearance of safety. (*Nelsen* v. *Jensen, supra,* 177 Cal.App.2d at p. 272; Prosser, Torts (3d ed.) p. 390.) The evidence demonstrates that Joseph Cooper did not tumble into the pool across the narrow concrete deck just outside the patio door, but fell into the pool at its far corner, away from the house. Inferably, he came outdoors and walked around the pool before falling in. The only available evidence is that the pool, although unlighted, was visible. At the point of the accident there was no deceptive appearance of safety.

▮ Nevertheless the trial court erred in granting the nonsuit, for the defendants had engaged in a course of active conduct which the jury could have found negligent. As isolated factors in the set of conditions culminating in accident, the pool and the absence of warning were inactive elements. The accident resulted not from these inactive elements alone, but also from a set of affirmative activities in the conduct of which defendants owed their guests a duty of care.

Defendants sponsored in their home a party attended by 100 to 150 youths, many of whom had never been on the premises. The record does not indicate the size of defendants' home, but there are few homes large enough to accommodate such a large party of young people without a tendency to spillage outdoors. As parents defendants could be expected to recognize that some at least of their youthful guests would or might display flighty and immature inclinations. The party involved defendants in a set of preparations, including the arrangement of the enclosed patio. Among the patio arrangements were the heater placed against one door, a bar and bartender stationed at the other door. Mr. Richey's precise motive for establishing these barriers is far from clear. Perhaps, in his mind, they formed safety precautions to prevent anyone from opening a door and blindly falling into the pool across the narrow band of concrete between it and the rear patio wall. Perhaps, as he testified, he simply ''saw no necessity for [anyone] being out in the pool area.''

Mr. Richey undertook further activity. He made inspection tours of the party. According to his testimony, the heater continued to guard one door, the bar-bartender combination the other. A jury might infer from these activities, the placement of barriers and the occasional inspections, a recognition of danger and a failure so to conduct these activities as to

minimize the danger. The barriers were part of the condition of the premises at the time of Joseph Cooper's entry. If Joseph was required to accept these conditions "as he found them" upon entry, these conditions (according to plaintiffs' evidence) underwent a change which increased the risk of injury to guests. According to plaintiffs' evidence, the heater was moved to permit exit to the pool by one door, while the bartender, noticed in other parts of the house, no longer guarded the other. Guests were seen in the pool area, a circumstance permitting the inference that the doors were no longer blocked or guarded. As stated in *Newman* v. *Fox West Coast Theatres, supra,* 86 Cal.App.2d at page 432. ". . . there occurred on the premises a new condition involving greater risk of injury. . . ." The death of Joseph Cooper, the jury could have found, resulted from the combined effect of the dangerous (if passive) condition of the premises and the negligent active conduct of defendant.

Defendants, holding a party for 100 to 150 milling teenagers in proximity to recognizable danger, cannot be equated with the absentee landowner whose occasional licensee encounters danger in remoteness and isolation. (See, for example, *Palmquist* v. *Mercer, supra,* 43 Cal.2d 92.) If the jury found negligence, the actionable wrong would consist not of maintenance of a dangerous swimming pool, but of negligence in the active conduct of a party for a large number of youthful guests in the light of knowledge of the dangerous pool. As stated in *Oettinger* v. *Stewart, supra,* 24 Cal.2d at page 138: ". . . it is now generally held that in cases involving injury resulting from active conduct, as distinguished from condition of the premises, the landowner or possessor may be liable for failure to exercise ordinary care toward a licensee whose presence on the land is known or should reasonably be known to the owner or possessor."

In a sense, oversight in failing to prevent removal of the barriers at the patio doors was an omission, not an affirmative act. Although the immediate occasion for injury may be an omission, yet if that omission occurs in the course of affirmative conduct, it is the negligent affirmative action rather than the subsidiary omission which is the cause of injury. If X negligently fails to look rearward toward the guest standing in his driveway and backs his automobile over him, the cause of injury is not merely the failure to look but affirmative negligence in the operation of the automobile. The failures shown by plaintiffs' evidence were characteristics of the affirmative

course of conduct in which defendants had engaged. (See *Howard* v. *Howard,* 186 Cal.App.2d 622, 625-626 [9 Cal.Rptr. 311] ; *Herold* v. *P. H. Mathews Paint House,* 39 Cal.App. 489, 493-494 [179 P. 414] ; see also Prosser, Torts (3d ed.) pp. 335-336.) Whether defendant's active conduct was negligent was a jury question. (*Johnson* v. *Nicholson,* 159 Cal.App.2d 395, 409 [324 P.2d 307] ; *Biondini* v. *Amship Corp.,* 81 Cal. App.2d 751, 766 [185 P.2d 94].) The question should have been submitted to the jury.

Judgment reversed.

Pierce, P. J., and Regan, J., concurred.